FILED 21 JUN '22 10:52 USDC-ORP

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF OREGON, PORTLAND (3) DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 3:07-CR-00403-SI-16 |
| | ) |
| ADEMIR HERNANDEZ ARCIGA, | ) |
| | ) |
| Defendant. | ) |

## MOTION TO REDUCE SENTENCE PURSUANT
## TO 18 U.S.C. § 3582(c)(1)(A)(i)

**COMES NOW**, the Defendant, Ademir Hernandez-Arciga ("Hernandez-Arciga"), acting on his own behalf, and respectfully moves this Honorable Court to use its discretion and issue and order reducing his sentence to time served based on the "extraordinary and compelling reasons" discussed below pursuant to the recently amended 21 U.S.C. § 851 and 18 U.S.C. 3582(c)(1)(A)(i). And if oral argument is necessary, Hernandez-Arciga requests the appointment of the Federal Defender's Office to assist him.

## TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................ 1

DISCUSSION ............................................................................................... 2

   A. The Court Has Jurisdiction to Grant Release for Extraordinary and
      Compelling Reasons ............................................................................. 2

   B. The Relief Requested Here Is Consistent With Both The Text of The Statute
      And The Commission's Policy Statement ...................................................... 4

      1. Congress Did Not Limit "Extraordinary and Compelling Reasons" to a Specific
         Enumerated, Set of Circumstances .................................................... 4

      2. The U.S. Sentencing Commission Has Not Limited "Extraordinary and
         Compelling Reasons" for Compassionate Release to Medical, Age Related,
         Or Family Circumstances ................................................................ 5

      3. Extraordinary and Compelling Circumstances Warrant a Reduction in
         Hernandez-Arciga's Case .............................................................. 8

         a. *The Government's Abuse of Its Discretion in Filing § 851 Informations* ................ 8

         b. *Hernandez-Arciga's 1989 California Conviction For Simple Possession
            Of One Gram Of Heroin Is No Longer A Qualifying Offense For § 851
            Enhancement Purposes* .............................................................. 16

         c. *The Dangers Of The COVID-19 Pandemic And Its Variants Delta
            And Omicron, And Hernandez-Arciga And His Mother's Concern* ................... 18

   C. The Criteria for Reassessing the Length of Hernandez-Arciga's Sentence
      Weigh Strongly In Favor of a Sentence Reduction ........................................ 24

      1. Hernandez-Arciga is Not a Danger ...................................................... 24

      2. The § 3553(a) Factors Weigh Strongly in Favor of Relief .............................. 26

   D. Hernandez-Arciga Is Deserving of Mercy ................................................... 28

CONCLUSION ............................................................................................ 30

CERTIFICATE OF SERVICE .............................................................................. 31

## TABLE OF AUTHORITIES

<u>**Supreme Court Cases**</u>                                                                                            <u>**Page**</u>

*United States v. Booker,*
  *543 U.S. 220 (2005)* …………................................................................ 6, 17

<u>**Court of Appeals Cases**</u>

*United States v. Da Cai Chen,*
  *127 F.3d 286, 291 (2nd Cir. 1997)* ……………………………....………………….…... 7

*United States v. Pierninanzi,*
  *23 F.3d 670, 683 (2nd Cir. 1994)* ……………………………………....……………….... 7

<u>**District Court Cases**</u>

*United States v. Arey,*
  *2020 WL 2464796 at \*14 (W.D. Va. 2020)* ................................................................. 15

*United States v. Arreola-Bretado,*
  *2020 WL 2535049, at \*3 (S.D. Cal. May 15, 2020)* ……….....……………………..…. 25

*United States v. Beck,*
  *2019 WL 2716505, at \*6 (M.D.N.C. June 28, 2019)* ……….....…………………………. 8

*United States v. Cantu,*
  *2019 WL 2498923, at \*3 (S.D. Tex. June 17, 2019)* ………....…………………........... 3, 7, 8

*United States v. Cantu-Rivera,*
  *2019 WL 2578272, at \*1 (S.D. Tex. June 24, 2019)* ……….....……………………………. Passim

*United States v. Carlos A. Galaz-Felix,*
  *Case No. 1:03-CR-00062-TC, ECF No. 879, (D. Utah Apr. 4, 2022)* ...................................... 16

*United States v. Kepa Maumau,*
  *2020 WL 806121 (D. Utah Feb. 18, 2020)* ……….....……………………………………. 12

*United States v. McGraw,*
  *2019 WL 2059488, at \*2 (S.D. Ind. May 9, 2019)* …………….........……………………….. 8

*United States v. Simmons,*
  *2019 WL 1760840, at \*8 (E.D.N.Y. Apr. 22, 2019)* ……....……………………………… 20

*United States v. Vazquez,*
  *No. 2:06-cr-196-TC, 2020 WL 7247069, at \*5–6 (D. Utah Dec. 9, 2020)* ............................... 16

*United States v. Villafuerte-Diaz,*
   *2020 U.S. Dist. LEXIS 133478 (S.D. Cal. July 28, 2020)* ……….................…...…………….. 24

**Statutes**

18 U.S.C. § 924(c)(1)(A) ....................................................................................... *passim*

18 U.S.C. § 3142(g) ……………………………………………………………….. 24

18 U.S.C. § 3553(a) …………………………………………………….…….... *passim*

18 U.S.C. § 3582 ……………………………………………………….…………. *passim*

21 U.S.C. § 846 ..................................................................................................... 1

21 U.S.C. § 851 …………………………………………………………….…….. *passim*

28 U.S.C. § 992(a)(2) ……………………………………………………………... 6

28 U.S.C. § 994(t) ……………………………………………………………...…………. 6

P.L. 98-473, 98, Stat. ……………………………………………………….……... 3

P.L. 115-391, 132, Stat. …………………………………...............…………………… 3

**Sentencing Guidelines**

U.S.S.G. § 1B1.13 ……………………………………………………….…...….. *passim*

Guideline Amendment 782 ……………………………………………….…….. 15, 17, 30

**Other Authorities**

S. Rep. No. 98-255, at 52, 53 n.74 (1983) …………………………….....………………. 4, 5

*The Answer is No: Too Little Compassionate Release in US Federal Prisons,*
Human Rights Watch, at 2 (Nov. 2012), https: // www. Hrw.org /sites/ default/files/
reports/us1112 For Upload Sm.pdf. …………………………………….…………………….. 5

## FACTUAL BACKGROUND

On October 25, 2010, Hernandez-Arciga was sentenced to a 240-month mandatory minimum sentence and a consecutive 60-month mandatory minimum sentence, following a unanimous jury conviction on count one, conspiracy to distribute and to possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 846; 841(a)(1); 841(b)(1)(A) and count two, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 922(c)(1)(A). The prosecutor enhanced Hernandez-Arciga's sentence under 21 U.S.C. § 851. He was sentenced when he was 39 years old, and Hernandez-Arciga has now served over 14 years of that sentence. His projected release date is April 25, 2029. Hernandez-Arciga's post-conviction motions were unsuccessful.[1]

On April 29, 2022, Hernandez-Arciga provided a Request for Compassionate Release ("Request") to M. Breckon, the Warden at the North Lake CI, asking that he move this Court for a reduction of his sentence due to the dangers posed by the COVID-19 pandemic and to care for his elderly mother. He also requested a reduction from the then enhanced 20-year mandatory minimum to the now 15-year mandatory minimum. Hernandez-Arciga made his request under 18 U.S.C. § 3582(c)(1)(A)(i) in light of the First Step Act's changes to 21 U.S.C. § 851 and 18 U.S.C. § 3582(c)(1)(A). *See A Copy of Hernandez-Arciga's April 29, 2022, Request, attached hereto as*

---

[1] On January 12, 2012, The Tenth Circuit affirmed Hernandez-Arciga's case. *United States v. Hernandez-Arciga, 486 Fed. Appx. 576 (10th Cir. 2012).* On July 25, 2014, the Court denied Hernandez-Arciga's 28 U.S.C. § 2255 Motion to Vacate, Set Aside or Correct Sentence. *See United States v. Hernandez-Arciga, Case No. 3:13-CV-00064-HA, 2014 WL 3729151 (D. Oregon July 25, 2010).* Hernandez-Arciga did not move the United States Supreme Court for a *writ of certiorari.*

*Exhibit "A."* As of the date of this filing, the Warden has not answered Hernandez-Arciga's Request or filed a motion with this Court on his behalf.[2]

Thanks to the amendments to § 851 and § 3582(c)(1)(A) that were part of the First Step Act, the Court is now empowered to reduce Hernandez-Arciga's sentence to time served, and Hernandez-Arciga begs the Court to use its discretion and do just that for the reasons set forth below. *See P.L. 115-391, 132 Stat. 5194, at § 401(a)(2)(A)(i) and § 603(b) (Dec. 21, 2018).*

## DISCUSSION

The Court has the authority to reduce Hernandez-Arciga's sentence to time served based on the extraordinary and compelling circumstances presented here. *First*, it has the jurisdiction to hear this motion because more than 30 days have elapsed since Hernandez-Arciga provided his Request to the warden, and the Director of the Federal Bureau of Prisons ("BOP") has not filed a motion with this Court on Hernandez-Arciga's behalf. *Second*, the changes to 18 U.S.C. § 3582(c)(1)(A)(i) made by the First Step Act have finally vested the Court with the authority to decide when extraordinary and compelling circumstances warrant a sentence reduction. And *third*, as this Court may already be aware, the circumstances presented here justify a sentence reduction.

### A. The Court Has Jurisdiction to Grant Release for Extraordinary and Compelling Reasons

The compassionate release statute was first enacted as part of the Comprehensive Crime Control Act of 1984. It provided that a district court could not modify a final term of imprisonment except in four situations, one of which was the existence of "extraordinary and compelling reasons"

---

[2] On April 29, 2022, Hernandez-Arciga personally placed his request for compassionate release in the prison mail system. As of this date, the warden has not responded or filed a motion for compassionate release to this Court on Hernandez-Arciga's behalf.

warranting the reduction, as determined by the sentencing court. But although the courts had the

final decision-making authority over whether a sentence would be reduced, the statute imposed a

gatekeeper—that authority could be invoked only upon motion by the Director of the BOP.

Without such a motion, sentencing courts were powerless to reduce a prisoner's sentence, even if

the court concluded that extraordinary and compelling reasons warranted the reduction. *18 U.S.C.*

*3582(c)(1)(A)(i); see also P.L. 98-473, 98, Stat. 1837 (Oct. 12, 1984).*

That changed when Congress enacted the First Step Act, which amended § 3582(c)(1)(A). *See*

*P.L. 115-391, 132, Stat. 5194, at § 603 (Dec. 21, 2018).* Under the amended statute, a court can

now reduce a sentence for "extraordinary compelling reasons" in *two* circumstances: (i) if the

Director of the BOP files a motion requesting such relief; or (ii) "upon motion of the defendant,"

if the defendant has fully exhausted all administrative remedies to appeal the BOP's failure to

bring a motion, or if 30 days have elapsed "from the receipt of such a request by the warden of the

defendant's facility," whichever is earlier. *18 U.S.C. § 3582(c)(1)(A); see also United States v.*

*Cantu, No. 1:05-CR-458-1, 2019 WL 2498923, at *3 (S.D. Tex. June 17, 2019)* ("Under the newly

amended § 3582(c)(1)(A) [the defendant] has standing to bring this motion because more than 30

days elapsed between his reduction-in-sentence request to the warden and a response."); *United*

*States v. Cantu-Rivera, No. CR H-89-204, 2019 WL 2578272, at *1 (S.D. Tex. June 24, 2019)*

(defendant's "petition . . . meets the requirement of a lapse of 30 days from the receipt by the

warden of the defendant's facility . . . The Court therefore has the authority to address the motion

of the defendant."). As noted above, Hernandez-Arciga submitted his Request to the warden at his

facility on April 29, 2022. As of the date of this filing, more than 30 days have passed after

Hernandez-Arciga submitted his Request and the Bureau of Prisons has neither denied Hernandez-

Arciga's application nor filed a motion with this Court on his behalf. Accordingly, Hernandez-

Arciga is entitled to bring his motion directly to the Court pursuant to 18 U.S.C. § 3582(c)(1)(A),

and this Court is vested with the jurisdiction to rule on the requested relief.

**B. The Relief Requested Here Is Consistent With Both The Text of The Statute and The Commission's Policy Statements**

1. <u>Congress Did Not Limit "Extraordinary and Compelling Reasons" To a Specific Enumerated Set of Circumstances</u>

Congress did not define what would constitute an "extraordinary and compelling reason"

warranting a reduction of a sentence under § 3582(c). Indeed, the legislative history confirms that

it intended to grant federal sentencing courts broad discretion to make those determinations on a

case-by-case- basis, and to reduce fundamentally unfair sentences where such reasons exist.

Congress' initial goal in passing the Comprehensive Crime Control Act was to abolish federal

parole and create a "completely restructured guidelines sentencing system." *S. Rep. No. 98-255,*

*at 52, 53 n.74 (1983)*. But with the elimination of parole, as a corrective measure in cases where

early release is warranted, Congress recognized the need for an alternative review process. It

therefore allowed for judicial reduction of certain sentences under § 3582(c):

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which *other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defen[ant] was convicted have been later amended to provide a shorter term of imprisonment.

*Id. at 55-56 (emphasis added).*

Put differently, rather than having the Parole Commission review every federal sentence,

Congress decided to let sentencing courts decide, in a far narrower band of cases presenting

extraordinary and compelling circumstances, if "there is a justification for reducing a term of imprisonment," *id. at 56.*

The situations listed in § 3582(c) were thus intended to serve as "safety valves for modification of sentences," enabling sentence reductions when justified by factors that previously could have been addressed through the (now abolished) parole system. *Id. at 121.* This approach was intended to keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, and it permitted "later review of sentences in particularly *compelling situations.*" *Id. (emphasis added).* Notably, Congress imposed no limitations on courts' authority to make such determinations, declining to define what constitutes "extraordinary and compelling reasons" or to otherwise constrain judges' discretion. The mandate was simple: If extraordinary and compelling circumstances were present, they would "justify a reduction of an unusually long sentence." *S. Rep. No. 98-255, at 55-56.*

Unfortunately, the establishment of the BOP as a gatekeeper effectively eliminated the safety valve. The BOP, which is of course part of the Department of Justice, hardly ever opened the gate.[3] As a result, Congress, through the First Step Act, allowed direct access to the sentencing court once an inmate's request to the BOP has been exhausted.

2. The U.S. Sentencing Commission Has Not Limited "Extraordinary and Compelling Reasons" for Compassionate Release to Medical, Age-Related, or Family Circumstances

When enacting § 3582(c), Congress delegated the responsibility for expounding upon what constitutes "extraordinary and compelling reasons" to the U.S. Sentencing Commission (the

---

[3] *See, e.g., The Answer is No: Too Little Compassionate Release in US Federal Prisons*, Human Rights Watch, at 2 (Nov. 2012), *https:// www.hrw.org/ sites/ default/ files/ reports/ us1112 For Upload Sm. Pdf* (noting that between 1992 and 2012, the average annual number of prisoners who received compassionate release following a motion by the BOP was less than two dozen).

"Commission"). *See 28 U.S.C. § 994(t)* ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also 28 U.S.C. § 992(a)(2)* (the Commission shall promulgate general policy statements regarding "the sentence modification provisions set forth in section[ ] . . . 3582(c) of title 18"). The resulting policy statement by the Commission sets forth the following factual considerations: (i) the medical condition of the defendant (including terminal illness and other serious conditions and impairments); (ii) the age of the defendant (for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment); (iii) the family circumstances of the defendant (where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver); and (iv) "other reasons" as determined by the BOP. *United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13, Application Note 2.* In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." *Id.*

As the above language makes clear, extraordinary, and compelling reasons for a sentence reduction may exist even when an inmate is not elderly, ill, or facing complicated family circumstances. And although the policy statement—which has not been amended since the passage of the First Step Act—vests the Director of the BOP with the authority to determine when such "other reasons" might warrant a reduction in a particular case, that language is now irreconcilable with the revised statute, which permits a defendant to bring a § 3582 motion to the Court without any response from the BOP or even if the BOP expressly decides that no reasons warrant a reduction of sentence. Accordingly, that aspect of the commentary is not binding on the courts for two reasons: (1) the Guidelines are advisory only, *see United States v. Booker, 543 U.S. 220*

*(2005)*; and (2) it is inconsistent with the text and the undisputed purpose of the First Step Act. *See United States v. Da Cai Chen, 127 F.3d 286, 291 (2nd Cir. 1997)* (commentary that relates to a statute, or to a guideline that mirrors a statute (as here), is not entitled to deference); *see also United States v. Pierninanzi, 23 F.3d 670, 683 (2nd Cir. 1994)*. Indeed, at least three district courts, since the passage of the First Step Act, have observed that § 1B1.13 "has not yet been updated to reflect that defendants (and not just the BOP) may move for compassionate release." *United States v. McGraw, No. 2:02-CR-00018 (LJM)(CMM), 2019 WL 2059488, at *2 (S.D. Ind. May 9, 2019)* ("[b]ecause the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect.); *Cantu-Rivera, 2019 WL 2578272, at *2 n.1; see also Cantu, 2019 WL 2498923, at *4* ("Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of the sentence-modification provisions under § 3582.").

The Court's authority to reduce Hernandez-Arciga's sentence is not only consistent with the statute, but also with the language in the policy statement, which makes clear that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction)" and encouraging the filing of a motion for compassionate release where a defendant "meets any of the circumstances set forth in [the] Application Note." As mentioned above, in amending the language of 18 U.S.C. § 3582(c)(1)(A), Congress finally empowered *courts* to make this critical determination, even in the face of a BOP finding that a defendant's case is not extraordinary or compelling.

Thus, just a few years ago, a district court in Texas held as follows:

7

The correct interpretation of § 3582(c)(1)(A)—based on the text, statutory history and structure, and consideration of Congress's ability to override any of the Commission's policy statements 'at any time' [. . .]—is that when a defendant brings a motion for sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. N.1(A)-(C) warrant relief.

*Cantu, 2019 WL 2498923, at \*5.*

This Court, therefore, may make an independent assessment of Hernandez-Arciga's case in considering whether extraordinary and compelling reasons warrant a reduction of his sentence.[4]

3. <u>Extraordinary and Compelling Reasons Warrant a Reduction in Hernandez-Arciga's Sentence</u>

   a. *The Government's Abuse of Its Discretion in Filing § 851 Informations*

Hernandez-Arciga's personal involvement did not include large amounts of drugs or large sums of currency. It did not involve violence, a credible threat of violence, or his actual use of a firearm. Nor did it involve large-scale drug trafficking organizations, gangs, or cartels. It all came down to the intercepted telephone conversations and the drug seizures of his co-defendants. Including an intercepted cellular telephone call, which captured Hernandez-Arciga discussing exchanging methamphetamine for a 9mm handgun, and a search of Hernandez-Arciga's residence which revealed an unloaded .40 caliber handgun found in a safe. This, according to 21 U.S.C. §§

---

[4] *See also Cantu, 2019 WL 2498923, at \*4* ("Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the *appropriate use* sentence-modification provisions under § 3582."); *Cantu-Rivera, 2019 WL 2578272, at \*2 n.1* (finding authority to determine that defendant was entitled to relief under the catch-all provision in the commentary to § 1B1.13 because the "current policy statement predates the enactment of the First Step Act and is not likely to be amended within the foreseeable future due to a lack of a sufficient number of serving members of the Sentencing Commission."); *United States v. Beck, No. 1:13-CR-186-6, 2019 WL 2716505, at \*6 (M.D.N.C. June 28, 2019)* ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

841(a)(1) and 841(b)(1)(A), should have resulted in a 10-life statutory mandatory sentencing range.

But Hernandez-Arciga decided on having a trial, and thirty-three months after his January 6, 2008, arrest, without any information that was not already known, and only after he refused to enter into a plea agreement, the Government filed a § 851 information. This subjected him to an enhanced 20-year statutory mandatory minimum sentence. And although Hernandez-Arciga protested the injustice of being punished for exercising his constitutional right to a speedy and public trial, his lawyer maintained that the government will not withdraw the § 851 information unless Hernandez-Arciga waived his trial right and pleaded guilty. He refused, the § 851 information was not withdrawn, and on October 25, 2010, Hernandez-Arciga was ultimately sentenced to an enhanced twenty-year mandatory minimum on count one and a consecutive five-year mandatory minimum on count two.

Four years later, the Government's use of § 851 as a weapon to force criminal defendants into pleading guilty (or as punishment for insisting on going to trial) was rightfully condemned by at least one United States Attorney General ("AG"). As noted in the Commission's July of 2018 Report on the Application and Impact of 21 U.S.C. § 851 ("Report"), following the United States Supreme Court's 2013 decision in *Alleyne v. United States, 570 U.S. 99 (2013)*, AG Holder issued a new policy refining the Department of Justice's charging policy regarding mandatory minimums for certain nonviolent, low-level drug offenders. *Id. at 914*.[5] The Smart of Crime Initiative instructed that "prosecutors should decline to charge the quantity necessary to trigger the mandatory minimum sentence if the defendant meets" certain criteria. The memorandum further

---

[5] The Report cites a Memorandum from Attorney General Eric Holder on Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases (Aug. 12, 2013), available at *https:// www. Justice.gov/oip/foia-library/ ag-guidance_on_section_851_enhancements_in_plea_negotiations/download*.

provided that "[p]rosecutors should decline to file an information pursuant to 21 U.S.C. § 851 unless the defendant is involved in conduct that makes the case appropriate for severe sanctions," instructing that prosecutors consider the following factors:

- Whether the defendant was an organizer, leader, manager, or supervisor of others within a criminal organization;

- Whether the defendant was involved in the use or threat of violence in connection with the offense;

- The nature of the defendant's criminal history, including any prior history of violent conduct or recent prior convictions for serious offenses;

- Whether the defendant has significant ties to large-scale drug trafficking organizations, gangs, or cartels;

- Whether the filing would create a gross sentencing disparity with equally or more culpable co-defendants; and

- Other case-specific aggravating or mitigating factors.

The following year, September 24, 2014, AG Holder issued additional guidance regarding the role of plea negotiations in filing recidivist enhancements. *Id. at Page 13,* ¶*8.*[6] Referencing the previously provided list of factors, the guidance explicitly states that "[w]hether a defendant is pleading guilty is not one of the factors enumerated in the charging policy." It further provided that the "enhancement should not be used in plea negotiations for the sole or predominant purpose of inducing a defendant to plead guilty." Acknowledging that there may be certain circumstances (for example, new information, recognition of cooperation, or a reassessment of the strength of the

---

[6] The Report cites a Memorandum from Attorney General Eric Holder on Guidance Regarding § 851 Enhancements in Plea Negotiations (Sept. 24, 2014), available at *https:// www. Justice.gov/oip/foia-library/ ag-guidance _on_ section_851_enhancements_in_plea_negotiations/download.*

case) that may warrant foregoing or dismissing a previously filed information in connection with a guilty plea, it concluded that "[a] practice of routinely premising the decision to file a[ ] § 851 enhancement solely on whether a defendant is entering a guilty plea, however, is inappropriate and inconsistent with the spirit of the policy."

In May of 2017, however, AG Jefferson Sessions rescinded both of AG Holder's policies regarding § 851 and issued guidance reverting to the previous policy that "prosecutors should charge and pursue the most serious, readily provable offenses," and stating that "the most serious offenses are those that carry the most substantial guideline sentences, including mandatory minimum sentences." *Id. at ¶19.*[7] In rescinding AG Holder's policies regarding § 851, AG Sessions knowingly deprived criminal defendants of their constitutionally protected right to a speedy and public trial by punishing them solely for exercising their Sixth Amendment right. *See U.S. Const. Amen. VI.*

This is because, the Commission's Report points to its 2011 Report on Mandatory Minimums and notes that prosecutors reported a wide variation in the practices surrounding the filing of a § 851 information seeking enhanced mandatory minimum penalties during the course of Commission visits to 13 judicial districts over the period of June through August 2011. *Report at Page 20, ¶6, citing the Commission's 2011 Mandatory Minimum Report.* The Commission also noted that in districts in which a § 851 information was always filed, prosecutors described the enhanced penalties as a *"hammer for the worst offenders,"* but otherwise too harsh for low-level drug offenders (*emphasis added*). When it came to a criminal defendant's trial right, prosecutors did advise Commission staff that a § 851 information would always be filed in any case where the

---

[7] The Report cited a Memorandum from Attorney General Jefferson Sessions on Department Charging and Sentencing Policy (May 10, 2017), available at *https:// www.justice.gov /opa/ press-release/file/965896/download.*

offender insisted on going to trial. *Id. at Page 21, ¶1.* Thus, from their own mouth's prosecutors admit to actively subverting inalienable rights.

But five years before the Commission's 2018 report on the application and impact of § 851, and four years before AG Session's May 17, Memorandum on Department Charging and Sentencing Policy, in *United States v. Kupa, 976 F. Supp. 2d 417 (2nd Cir., N.Y., Oct. 9, 2013)*, the Honorable John Gleeson, United States District Judge, eloquently went through legislative history, AG Memorandums, the Commission's 2011 Report on Mandatory Minimums, and the damage caused by the misuse of prosecutorial discretion to come to the conclusions that § 851—the sentencing equivalent of a two-by-four (or sledgehammer) to the forehead—should not be used for the indefensible purposes of coercing guilty pleas, punishing those who go to trial, and to fend off appeals. In support, of his conclusion, Judge Gleeson provides:

- Since 1986, our legislative scheme of drug offense mandatory minimums has included recidivist enhancements that double down on those mandatory minimums or convert them into mandatory life in prison;

- Earlier recidivist enhancements, enacted in the 1950's, were automatically applicable until 1970, when Congress made them discretionary at DOJ's request because they mandated excessively long sentences in too many cases;

- The post-1970 regime, specifically designed by prosecutors to allow them to subject only the truly hardened, professional drug traffickers to harsh recidivist enhancements, was derailed by the sentencing reform movement. Prompted by the United States Sentencing Guidelines, DOJ created a policy that essentially made the filing of prior felony informations automatic again, with an exception for those who plead guilty;

- The reversion to automatic filing of prior felony informations resulted in the past two decades in the entrenched practice of using them to strongarm guilty pleas and to punish those who refuse to plead guilty;

- This practice routinely produces egregiously severe sentences, and judges have uniformly expressed frustration at being required to impose them;

- Prior felony informations have helped to create the dramatically reduced trial rate in the federal system, and the disappearance of trials threatens great damage to our system;

- The 2013 Holder Policy fails to cure the prior felony information problem;

- The Attorney General needs to expressly prohibit the use of prior felony informations to coerce defendants into pleading guilty or to punish those who refuse to do so;

- The Attorney General needs to create a policy that narrows the field of eligible defendants so that prior felony informations are filed only against the hardened professional drug traffickers who deserve their extreme severity;

- The Attorney General needs to lead the way toward providing realistic avenues of relief for the many who are serving excessive sentences because of the abusive use of prior felony informations over the past 25 years; and

- If DOJ's power to affect sentencing outcomes so dramatically through the filing of prior felony informations can't be exercised properly, Congress should take that power away.

As examples of the abuse of prosecutorial discretion, Judge Gleeson detailed the criminal cases of defendants Lulzim Kupa and Tyquan Midyett to pinpoint exactly how prosecutors utilize § 851 to coerce a guilty plea and punish those who refuse to plead guilty. Then, unable to catalog the miscarriage of justice in so many cases, he detailed the cases of Kenneth Harvey, Melissa Ross, *Taliafarro*, and *Wahl*. Lastly, he applauded the judge in *Jones* for invalidating the Government's § 851 information on grounds of prosecutorial vindictiveness in violation of the due process clause.

Just five months after the Commission's 2018 Report on the Application and Impact of § 851, December 21, 2018, the First Step Act (P.L. 115-391) was signed into law by the President. Among other things, the act adjusts the mandatory minimum sentences for certain drug traffickers with prior drug convictions. It reduces the 20-year mandatory minimum (applicable where the offender has one prior qualifying conviction) to a 15-year mandatory minimum and reduces the life sentence

13

mandatory minimum (applicable where the offender has two or more qualifying convictions) to a 25-year mandatory minimum. The act also changes the prior convictions criteria under which these mandatory minimum penalties apply. And in order for these mandatory minimums to apply, the offender's prior convictions must meet the new criteria for a *serious drug felony* or a *serious violent felony* rather than any felony drug offense. *See P.L. 115-391, 132 Stat. 5194, at § 401(a)(2)(A)(i)*.

Hernandez-Arciga shines a negative light on the Government's use of § 851 in his case. He provides the Commission's 2018 Report, Judge Gleeson's § 851 legislative history, and the First Step Act's changes in the hope to, at the very least, show the Court that his sense of injustice does not stem from being defeated at trial. No. That is what his post-conviction motions were designed to redress. Hernandez-Arciga's sense of injustice originated the very minute he was punished for insisting on going to trial. A punishment that became a reality on February 6, 2010, when the government filed the § 851 information. And culminated on October 25, 2010, when the Court sentenced him to a 20-year mandatory minimum sentence on count one.

Given the aforementioned information regarding § 851, Hernandez-Arciga's sense of injustice has merit and is shared by AG Holder, Judge Gleeson, and the countless criminal defendants who have suffered the same fate. Hernandez-Arciga's sense of injustice is also shared by Brett L. Tolman, the United States Attorney for the District of Utah.[8] And although the law in 2010 clearly prohibited the Court from imposing a sentence of less than 20 years, the First Step Act's changes to both § 851 and § 3582(c)(1)(A) now empower the Court to do just that—sentence Hernandez-Arciga to the newly amended 15-year mandatory minimum—because courts have considered a

---

[8] *See Testimony of Brett L. Tolman Former U.S. Attorney for the District of Utah*, Regarding S. 2123, the Sentencing Reform and Corrections Act of 2015 Senate Judiciary Committee, October 19, 2015. *See also The Salt Lake Tribune's July 9, 2018, article by Jessica Miller titled, "He used to be Utah's top federal prosecutor. Now Brett Tolman is trying to change the system he was a part of."*

subsequent change in a mandatory minimum sentence adopted *only prospectively* to create such a gross disparity between the defendant's sentence and those persons sentenced currently that it constitutes "extraordinary and compelling reasons" for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). *See United States v. Arey, 2020 WL 2464796, at \*14 (W.D. Va. 2020).*

So, just because he went to trial, Hernandez-Arciga should not have to serve five years more than those persons sentenced currently—for the very same conduct. And although amendment 782 would have reduced Hernandez-Arciga's guidelines sentencing range, U.S.S.G. § 5G1.1(a) operates to restrict the amended guideline range to 240 months to reflect the statutorily enhanced mandatory term of imprisonment. If Hernandez-Arciga's sentence is reduced to 15 years, and the Court applies § 924(c)'s exception clause and makes the 60-month term on count two concurrent, he would be immediately released. This is because he would receive 810 days of good conduct time, which subtracted from the expiration full term date of January 6, 2023, equals an October 18, 2020, statutory release date projected. This creates such a gross disparity between Hernandez-Arciga's sentence, and those persons sentenced currently that it constitutes "extraordinary and compelling reasons" for a sentence reduction. *See United States v. Arey, 2020 WL 2464796 at \*14 (W.D. Va. 2020).* Moreover, in *United States v. Kepa Maumau, No. 2:08-CR-00758-TC-11, 2020 WL 806121 (D. Utah Feb. 18, 2020)*, a district court found, *inter alia*, that the First Step Act's subsequent changes to 924(c)'s consecutive staking provision, which was adopted *only prospectively*, constituted "extraordinary and compelling reasons" for a sentence reduction and granted Maumau's motion; *see also Cantu-Rivera, 2019 WL 2578272,* (the court recognizes as a factor . . . the fundamental change to sentencing policy carried out in the First Step Act's elimination of [§ 851's] life imprisonment as a mandatory sentence solely by reason of a defendant's prior conviction). That same court granted compassionate release to two inmates

housed at North Lake CI who had 21 U.S.C. § 851 enhancements. *See United States v. Vazquez, No. 2:06-cr-196-TC, 2020 WL 7247069, at \*5–6 (D. Utah Dec. 9, 2020) (unpublished) and United States v. Carlos Armando Galaz-Felix, Case No. 1:03-CR-00062-TC, ECF No. 879, (D. Utah Apr. 4, 2022).*

> b. *Hernandez-Arciga's 1989 California Conviction For Transportation of Heroin is No Longer a qualifying offense for § 851 Enhancement Purposes*

Hernandez-Arciga admits that his case was indeed complicated. At trial, the government introduced intercepted telephone conversations, drug records, and codefendant testimony into evidence. In the special verdict form, the jury found Hernandez-Arciga guilty of 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, and more than five kilograms of a mixture or substance containing a detectable amount of cocaine. But because the government filed a § 851 enhancement, the Court was obligated to sentence Hernandez-Arciga to a 20-year statutory mandatory minimum on count one.

As argued above, however, the First Step Act of 2018 redefined serious drug felony as follows:

> A *serious drug felony* is defined as an offense described in 18 U.S.C. Section 924(e)(2)—which encompasses only drug felonies that carry a maximum prison term of 10 years or more—for which the offender served a term of imprisonment of more than 12 months and the offender's release from any term of imprisonment was within 15 years of the commencement of the instant offense.

*See P.L. 115-391, 132 Stat. 5194, at § 401(a)(2)(A)(i)*

Before the First Step Act, any prior conviction for a *felony drug offense* (meaning a drug offense with a maximum term of imprisonment of more than one year) counted for purposes of the repeat offender mandatory minimums. In light of the First Step Act's changes to serious drug felony, Hernandez-Arciga asserts that his 1989 state of California conviction, charged as transportation of

heroine, would no longer qualify as a predicate offense for § 851 enhancement purposes. This is because, prior to 2014, transportation of a controlled substance included taking drugs somewhere for personal use. Since then, the California legislature has amended HS 11352. "Transport" is now a crime under Section 11352 only if you move drugs from one place or another with the intent to sell them. But, because Hernandez-Arciga served only 204-days in the county jail (not 12 months), California Health and Safety Code § 11352 does not carry more than ten years (it now carries three to nine years), and Hernandez-Arciga's release from the county jail was not within 15 years of the commencement of the instant offense (it was actually 16 years later), it no longer qualifies as a predicate offense for § 851 information purposes.

So, in a perfect world, applying the principles outlined in *Booker,* with the exception of its remedial rule, and absent the § 851 enhancement, the Court could, in its discretion, reduce Hernandez-Arciga's 20-year statutory mandatory minimum sentence to a guidelines sentence. A sentence which can be further reduced by applying Guidelines Amendment 782 and § 924(c)'s exception clause, which would make the 60-month term on count two concurrent. But, as this Court well knows, we do not live in a perfect world, and it had to sentence Hernandez-Arciga to 25-years on counts one and two. Given that Hernandez-Arciga's life expectancy is only 77 years,[9] and he was almost 40 years old when he was sentenced, a 25-year term of imprisonment does not leave him with much of a future upon his release and removal to the country of Mexico. And, with his earned good time credits, Hernandez-Arciga is less than six years from completing his 25-year sentence. *See Hernandez-Arciga's BOP Sentence Monitoring Computation Data, attached hereto as Exhibit "B."*

---

[9] According to the United States Center for Decease Control, the life expectancy in the United States is 77 years. See https//www.cdc.gov/nchs/fastats/life-expectancy.html. But number is dramatically lower in the country of Mexico.

But even if the § 851 enhancement still applies in this case, as argued above, Hernandez-Arciga

asserts that the First Step Act's changes to both § 851 and § 3582(c)(1)(A) now empowers the

Court to use its discretion and sentence him to the newly amended 15-year mandatory minimum.

      c.  *The Dangers of the COVID-19 Pandemic and Its Variants Delta and Omicron,*
          *and Hernandez-Arciga and His Mother's Concerns*

Hernandez-Arciga begs the Court to please consider the COVID-19 pandemic's emergency

threat to the inmates at the North Lake CI. Its design makes it practically a detention center and

COVID-19 and its variants Delta and Omicron are rapidly spreading throughout the facility:

- Each Unit contains 26 cells in an upper level and 26 cells on the ground level, for a total of 52 cells. Each cell houses two inmates. The cells contain a double bunk bed, toilet and sink, mirror, a shelf with four hooks, and a stainless-steel table with two sitting areas. All the cells share the same ventilation system.

- The dayroom in each unit consists of 6032 square feet. Cluttered around the dayroom are: (i) five telephones, which are spaced 1½ feet apart; (ii) microwaves, one sink, one paper towel dispenser, and one hand sanitizer dispenser. They are all placed right next to each other; (iii) nine showers, which are right next to each other. They are separated by a 5-foot cinder block wall that extends 3½ feet from the main wall and provide 3½ feet of shower space. The shower area is separated by a 5-foot cinder block wall that's 28 feet long; and (iv) There are fourteen stainless-steel tables. Each table sits seven inmates right next to each other. The tables are placed 5½ feet from each other. They are staggered in the dayroom in seven rows of two.

Hernandez-Arciga is assigned to Echo-Charly unit, which houses about 104 inmates in very

close proximity. The design of the North Lake CI makes it virtually impossible to maintain a

hygienic living environment and implement the CDC guidelines, which include maintaining a

social distance of at least 6-feet. This, coupled with its handling of the COVID-19 pandemic,

makes it impossible for the North Lake CI to minimize or control the virus' spread. Every

additional day Hernandez-Arciga spends at the North Lake CI increases the likelihood of

contracting one of the COVID-19 variants and suffering serious illness or death. And although

Hernandez-Arciga has been vaccinated and has received a booster shot, the vaccine is not 100%
effective against the COVID-19 variants Delta and Omicron—and will not be effective against
any future variant of the virus. According to the CDC, some fully vaccinated people will become
infected (called a severe breakthrough infection) and experience severe illness, and death.[10]

In the early stages of the pandemic, the North Lake CI did not initiate COVID-19 mitigation
procedures until the first week of April 2020—when it put the facility on full lock down and
required that staff wear surgical masks. It did not provide surgical masks to the inmate population
until the second week of May 2020—but only after the inmates protested and initiated a social
disobedience campaign. And the BOP did not distribute washable cloth masks to the inmate
population until the middle of July 2020. Consequently, inmates contracted COVID-19, and some
died from it. Yet, the North Lake CI refused to test all of the inmates for COVID-19. But more
importantly, it refused to test all of the inmates who live in the housing units where seriously ill
inmates were removed and taken to medical for treatment. They also refused to test all of the
inmates who live in the housing units where inmates died. The situation was so bad that some, if
not most, of the medical staff quit and filed lawsuits. Some of the unit officers also quit and filed
lawsuits.

That, however, is not the worst of it. Today, some North Lake CI officers refuse to properly
wear their personal protective equipment. They don't wear their facemasks or gloves upon entering
the inmate housing areas. This endangers the inmate population because that is exactly how the
virus will enter the facility and propagate throughout.[11] Not long ago, the Fire and Safety Officer,

---

[10] As of August 30th, the CDC has received reports of 12,908 severe breakthrough cases of COVID-19 among fully
vaccinated people that resulted in hospitalization or death.

[11] Correctional Officers are Driving the Pandemic in Prisons - Government Executive (govexec.com). *See
https://www.govexec.com/management/2021/08/correctional-officers-are-driving-pandemic-prisons/184639/*

Mr. Morgan, got infected with the virus. And if that is not enough, through the worse of the pandemic, the North Lake CI continued to receive inmates from other facilities. Some arrived on August 20, 2020, and September 14, 2020, from a closed down GEO facility in the State of Georgia. And according to laundry staff, because the August 25, 2020, inmates arrived with COVID-19 symptoms, all of their clothes were destroyed. And even now, the BOP continues to send inmates to the North Lake CI.

Strangely, even with the advantages of hindsight, the North Lake CI continues to make the same mistakes in dealing with the recent outbreaks of the Delta and the Omicron variants. On January 6, 2022, it put Bravo Unit on lock-down. On January 8, 2022, it put Charly Unit on lock-down. And on January 10, 2022, it put Echo Unit on lock-down. It eventually put the whole facility on lock-down, but that did not prevent the virus' spread. And said lockdowns consist of isolating each unit, they do nothing to isolate the 406 inmates from each other to protect them from infection. As a consequence, inmates have now become infected and have been removed from their units. And some have died. But, just like before, the North Lake CI refuses to test all of the inmates who live in the housing units where seriously ill inmates have been removed and taken to medical for treatment. They also still refuse to test all of the inmates who live in the housing units where inmates have died. There is no way to know how many inmates are currently infected with COVID-19 or its Delta and Omicron variants.

On May 25, 2022, President Biden signed an executive order directing the Attorney General to continue to implement the core public health measures, as appropriate, of masking, distancing, testing, and vaccination in federal prisons. Among other things, the Attorney General must

determine how many individuals meet the requirements to be released on home confinement.[12] And, because only 49% of BOP staff have accepted the vaccine,[13] the President also ordered that all prison staff accept vaccination. This is in response to new research which found that correctional officers are driving the Pandemic in prisons and in their communities.[14]

Hernandez-Arciga is 51 years old, Hispanic, and a former smoker. He suffers from obesity and acute diverticulosis, which causes small, bulging pouches to develop in the digestive tract. In a 2021 National Library of Medicine study, it was determined that gastrointestinal symptomatology are of unique significance in COVID-19 patients, in contrast to other viral illnesses, owning to the fact that they often appear early and worsen during the disease course. While COVID-19-induced diverticulitis remains seemingly rare and largely unexplored, clinicians should maintain a broad differential diagnosis in COVID positive patients presenting with gastrointestinal symptoms. It is vital to institute SARS-CoV-2 precautions in patients who present with either respiratory or gastrointestinal symptoms amidst the current pandemic.

If Hernandez-Arciga is infected with COVID-19 or one of its variants, the GI symptoms caused by his acute diverticulosis, coupled with fever and other symptoms caused by the virus, will increase the risk of serious illness or death. Accordingly, Hernandez-Arciga meets the COVID-19 factors for early release in AG William Barr's March 26, 2020, Memorandum on Prioritization of

---

[12] Biden Moves to Improve Public Health Conditions in Federal Prisons and Jails - Government Executive (govexec.com). *See https://www.govexec.com/management/2022/05/biden-moves-improve-public-health-conditions-federal-prisons-and-jails/367452/*

[13] Less Than Half of Federal Bureau of Prisons Staff Have Accepted COVID Vaccines From the Agency - Government Executive (govexec.com). *See https://www.govexec.com/management/2021/03/less-half-federal-bureau-prisons-staff-have-accepted-covid-vaccines-agency/172775/*

[14] Correctional Officers are Driving the Pandemic in Prisons - Government Executive (govexec.com). *See https://www.govexec.com/management/2021/08/correctional-officers-are-driving-pandemic-prisons/184639/*

Home Confinement as Appropriate in Response to the COVID-19 Pandemic and April 3, 2020, Memorandum on Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 to the Director of the BOP. He is vulnerable to COVID-19, its variants Delta and Omicron, and future variants because he is Hispanic,[15] a former smoker,[16] suffers from obesity[17] and acute diverticulosis.[18] Hernandez-Arciga is a low-security inmate, has a minimum risk PATTERN score, he does not pose a danger to the community because he will be deported to Mexico upon his release and barred from reentry, indefinitely.

Hernandez-Arciga's concern, however, is for his only surviving elderly parent. As of June 9, 2022, COVID-19 and its variants have infected 85,084,715 people in the United States. And have tragically killed over 1,005,823 people.[19] Hernandez-Arciga's mother, Rosa Maria, is 75 years old. She suffers from several medical conditions: including hypertension, depression, anxiety, and stress. She became a widow 47 years ago when Hernandez-Arciga's father, who was a teacher, died of depression. Hernandez-Arciga was just four years old when his father died. According to

---

[15] CDC statistics as of August 18, 2020, show that the number of COVID-19 cases involving a Hispanic or Latino persons are 2.8 times higher than for white, non-Hispanic persons. The number of Hispanic cases that result in hospitalization are 4.6 time higher. And the number of Hispanic cases that result in death are 1.1 time higher. *See https:// www.cdc.gov/ coronavirus/ 2019-ncov/ covid-data /investigations- discovery /hospitalizations- by- race ethnicity .html.*

[16] According to the CDC, Smoking, current and former is an underlying medical condition that presents Higher risk for severe COVID-19 outcomes. *See Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19: Information for Healthcare Professionals | CDC.* CDC Website at https:// www.cdc .gov/ coronavirus/ 2019-ncov/ hcp/clinical-care/underlyingconditions.html.

[17] According to the CDC, Obesity (BMI ≥30 kg/m2)* is an underlying medical condition that presents Higher risk for severe COVID-19 outcomes. *See Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19: Information for Healthcare Professionals | CDC.* CDC Website at https:// www.cdc .gov/ coronavirus/ 2019-ncov/ hcp/clinical-care/underlyingconditions.html.

[18] SARS-CoV-2 and Acute Diverticulitis: the Expanding Gastrointestinal Manifestations of COVID-19 Infection - PMC (nih.gov). *See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8016353/*

[19] CDC COVID Data Tracker. See https://covid.cdc.gov/covid-data-tracker/#datatracker-home

the CDC's COVID-19 risk factors and the most recent reports from medical experts: age, ethnicity, and pre-existing medical conditions put Hernandez-Arciga's mother at risk for serious illness or death if she is infected with any of the COVID-19 variants. Given this grim reality, Hernandez-Arciga begs the Court to grant this motion and order his immediate release so he can return to Mexico to assist his mother and help her through the duration of the COVID-19 pandemic because, the way things are going in both the United States and Mexico, and according to the most recent scientific information, things may never really go back to normal, and Hernandez-Arciga's mother needs him financially and emotionally to help her weather this unpredictable storm.

Understandably, a parent's concern is for their son. And Hernandez-Arciga's elderly mother prays for his early release to prevent him from contracting any of the current or future COVID-19 variants and suffering serious illness or death. Moreover, after over 14 years of separation, it will be tragic for Hernandez-Arciga's mother to suffer the loss of her son to COVID-19, or its Delta and Omicron variants, due to the negligence of the North Lake CI. Likewise, after all she has been through, it will be tragic for Hernandez-Arciga to suffer the loss of his only surviving (elderly) parent to COVID-19, or its Delta or Omicron variants, or to one of her preexisting medical conditions while incarcerated.

In addition, a motion for relief under 18 U.S.C. § 3582(c)(1)(A)(i) requires a court to consider other factors that may warrant relief, including the defendant's rehabilitation, the sentencing disparities with his co-defendants, and other factors bearing on the person Hernandez-Arciga is today. *Cantu-Rivera, 2019 WL 2578272, at *2* (the court considered rehabilitation and the "unwarranted [sentencing] disparities among defendants" in determining resentencing was appropriate). As set forth below, these factors further establish the sort of "extraordinary and compelling reasons" that warrant a reduction of Hernandez-Arciga's 25-year sentence.

23

### C. The Criteria for Reassessing the Length of Hernandez-Arciga's Sentence Weigh Strongly in Favor of a Sentence Reduction

In determining whether Hernandez-Arciga's sentence should be reduced, the Court must decide, *inter alia*, whether Hernandez-Arciga presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); U.S.S.G. § 1B1.13(2). If he does not, the Court looks to the factors outlined in 18 U.S.C. § 3553(a). As explained below, all of these factors weigh strongly in favor of relief in Hernandez-Arciga's case.

### 1. Hernandez-Arciga is Not a Danger

If Hernandez-Arciga were released, he would not pose a danger to the community. He was the sixteenth defendant and was convicted of conspiracy to distribute controlled substances and possession of a firearm in relation to a drug trafficking crime. He will be certainly deported to Mexico upon his release and will be barred from reentering the United States—indefinitely. The resulting investigation and trial evidences that Hernandez-Arciga did not himself actively employ violence or firearms. As for firearms, an unloaded .40 caliber handgun was found inside of a safe. And although Hernandez-Arciga was charged with a § 924(c)(1)(A) offense, which deals with drugs and guns. It was because, during an intercepted telephone call, Hernandez-Arciga discussed exchanging methamphetamine for a 9mm handgun. But, under *Watson v. United States, 552 U.S. 74, 128 S. Ct. 579, 169 L. Ed. 2d 472 (2007)*, exchanging drugs for a firearm does not violate § 924(c)(1)(A). And, although it was said Hernandez-Arciga requested the firearm to defend himself, there is nothing in the trial record which indicates that he actually employed the weapon, and that particular weapon was never recovered. *See United States v. Villafuerte-Diaz, No. 19-CR-1063-GPC, 2020 U.S. Dist. LEXIS 133478 (S.D. Cal. July 28, 2020)* (Granting compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) and stating, "since she will be deported upon her release and

24

barred from reentry, she will not pose a danger to the community"); *United States v. Arreola-Bretado, No. 3:19-CR-03410-BTM, 2020 WL 2535049, at \*3 (S.D. Cal. May 15, 2020)* (granting 18 U.S.C. § 3582(c)(1)(A)(i) compassionate release for defendant convicted of importation of methamphetamine with no history of violent conduct and would be deported upon her release).

Hernandez-Arciga does not have ties to gangs. Had only one prior adult criminal conviction, which occurred when he was just 18 years old. A conviction for which he only served 210-days in the county jail. Moreover, as argued above, in light of the First Step Act, it no longer qualifies as a predicate offense for § 851 information purposes. He had no other previous adult convictions. Nothing in the facts of this case or in Hernandez-Arciga's history indicates that he would be a danger if released or otherwise mitigates against the sentence reduction requested here.

In regards to education, on October 3, 2017, Hernandez-Arciga received his General Education Diploma. While in prison, he has worked hard to better himself. He participated in thirteen continuing adult education classes—including Hobby Craft Painting and Art, Parenting Teenagers, Spanish GED 0730-0330, Parenting Ages 5-12, Spanish GED 1230-1430, The Way of The Samurai, Shattered Skies Air-to-Air CO, WALKING With The Dinosaurs, The Way of The Samurai, Reading is Fundamental, Mavis Beacon Typing Program, Hispanic Culture, and The Planets. He also completed the BOP's Non-Residential Drug Program. *See BOP Individualized Needs Plan – Program Review, attached hereto as Exhibit "C."*

Hernandez-Arciga had plans to participate in vocational training to prepare for his release and certain deportation to Mexico, but consistent with its policy of segregating private prisons based on alienage, on March 2, 2020, the BOP designated him to a medium-high prison run by the GEO Group: North Lake CI in Baldwin, Michigan. *See United States v. Olawoye, No. 1:15-CR-00172-AA-5, 2020 WL 4559816, at \*5 (D. Or. Aug. 7, 2020)* ("[A]t the private institution where he is

held, non-citizen inmates are segregated from citizen inmates, and given far less opportunity to participate in rehabilitative programing as well as poor health services.") (*citing Emma Kaufman, Segregation by Citizenship, 132 Harvard L. Rev. 1379, 1409-17 (2019)*). Hernandez-Arciga does not have access to vocational training. Nor does he have access to adequate medical care.

In regards to discipline, in the over 14 years of his imprisonment, Hernandez-Arciga has not received any disciplinary reports—he is a model inmate. He has strong family support which will serve as his bedrock should he be released. Has maintained close contact with his mother and siblings. And has stayed in contact with his sons, Jose David and Ademir Esteban. Given that he will be deported to Mexico upon his release, Hernandez-Arciga wanted to take full advantage of the vocational training programs offered by the BOP, but that is not possible at North Lake CI. Prior to his imprisonment, Hernandez-Arciga worked as a cook. He will find employment as a cook and will eventually open his own restaurant. And to ensure that Hernandez-Arciga successfully establishes himself in Mexico, his family has pledged unwavering support. Backed by his family, and in light of his history, there is no reason to believe Hernandez-Arciga will enter the United States illegally and pose a danger to the community.

2.  The § 3553(a) Sentencing Factors Weigh Strongly in Favor of Relief

This Court next weighs the factors set forth in 18 U.S.C. § 3553(a) to determine whether Hernandez-Arciga's motion for a sentence reduction should be granted. The applicable § 3553(a) factors include the nature and circumstances of the offense, history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to adequately deter criminal conduct. *18 U.S.C. § 3553(a), (2)(A)-(B).*

First, Hernandez-Arciga asserts that the nature and circumstances of the offense, his history and characteristics, and his post sentencing conduct all suggest that a sentence reduction to time served is warranted. As discussed above, Hernandez-Arciga was not charged with or convicted of a violent crime. And, although he was convicted of a firearms offense, it was because he discussed exchanging methamphetamine for a 9mm handgun. But he did not actively employ the gun during the course of the conspiracy. And the only gun that was recovered by law enforcement, a .40 caliber, was found (unloaded) inside of a safe during a search of his home. He received no guidelines enhancements characteristic of a violent offender.

Second, the over 14 years of imprisonment that Hernandez-Arciga has already served have been transformative for him. He is a model inmate and has dedicated himself to his rehabilitation (including drug rehabilitation) personifying the objectives of § 3553(a) that incarceration "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." This factor weighs heavily in support of granting relief. *See Cantu-Rivera, 2019 WL 2578272, at *2* (recognizing the "extraordinary degree of rehabilitation" Mr. Cantu-Rivera accomplished and caring for other inmates as factors justifying reduction in his sentence).

And finally, with the passage of the First Step Act, Congress made clear that § 851's newly amended 15-year mandatory minimum (applicable where the offender has one prior qualifying conviction) complies with § 3553(a)'s requirement that the sentence imposed reflects the seriousness of the offense, promotes respect for the law, and adequately deters criminal conduct. The substantial amount of time Hernandez-Arciga has already served, coupled with his guaranteed deportation to Mexico, along with his lifetime bar from legally reentering, is more than sufficient to achieve the objectives of his sentence—seriousness of the offense, respect for the law, and deter

criminal conduct. Under these specific circumstances, Hernandez-Arciga is not at risk of recidivism and the § 3553(a) factors weigh strongly in favor of relief.

### D.  Hernandez-Arciga Is Deserving of Mercy

With the passage of the First Step Act, Congress emphasized the imperative of reducing unnecessary incarceration and avoiding unduly *punitive* sentences that do not serve the ends of justice. *United States v. Simons, No. 07-CR-00874, 2019 WL 1760840, at \*8 (E.D.N.Y. Apr. 22, 2019).* The repercussions of Hernandez-Arciga's harsh sentence cannot be overstated. At the time of his arrest, Hernandez-Arciga was 37 years old. He had one prior adult conviction, which he received when he was just 18 years old, and only served 210-days in the county jail. A conviction which no longer qualifies as a predicate offense under § 851. With the death of his father, Hernandez-Arciga had a difficult childhood. But he grew up close to his mother and siblings. At the time of his sentencing hearing, Hernandez-Arciga was married and had two small children. Throughout his incarceration, even when his post-conviction motions failed and his wife separated from him and divorced him, Hernandez-Arciga maintained an optimistic and positive outlook on life. As described above, Hernandez-Arciga is a model inmate, and to prepare for his release and deportation to Mexico, he completed thirteen adult continuing education classes and put himself through drug rehabilitation. Today, he has a clear outlook on life and is completely drug free.

If the Court grants Hernandez-Arciga's motion, and sentences him to time served, it will have the fortunate effect of compensating for the increased severity of his punishment due to his deportable alien status, which makes him ineligible for Bureau of Prisons programs. This is because, Hernandez-Arciga has suffered a fortuitous increase in the severity of his sentence for over 170 months. He is stuck in a low security prison and the BOP will never designate him to a federal prison camp, which is a minimum-security prison. Nor will it ever designate him to home

confinement. He cannot participate in the BOP's Residential Drug Abuse Program, which gives an inmate one year off his prison sentence for successful completion. And the BOP will never approve a deportable alien's request to be designated to a BOP prison that is close to his family in the United States, which facilitates family visits. *See United States v. Smith, 27 F.3d 649, 651 (D.C. Cir. 1994)*; *United States v. Thomas, 999 F.3d 723 (D.C. Cir. 2021)*.

And if the Court grants Hernandez-Arciga's motion and applies § 924(c)'s exception clause, which would make the 60-month term on count two concurrent, it will make up for his improper conviction because *Watson v. United States, 552 U.S. 74, 128 S. Ct. 579, 169 L. Ed. 2d 472 (2007)* abrogated the Ninth Circuit's in *United States v. Ramirez–Rangel, 103 F.3d 1501, 1506 (9th Cir.1997)*, that a person who receives a firearm in trade for drugs "uses" the firearm for the purposes of § 924(c)(1)(A). Under *Watson*, however, "a person does not 'use' a firearm under § 924(c)(1)(A) when he receives it in trade for drugs." *Watson, 552 U.S. at 83, 128 S. Ct. 579 (emphases added)*. But *Watson* left undisturbed the Supreme Court's holding that one who supplies a firearm in exchange for drugs "uses" the firearm for the purposes of § 924(c). *Id.; Smith v. United States, 508 U.S. 223, 113 S. Ct. 2050, 124 L.Ed.2d 138 (1993)*.

Hernandez-Arciga was convicted under 18 U.S.C. § 924(c)(1)(A) because he exchanged methamphetamine for a 9mm handgun. There is no evidence in the trial record that he actually employed the handgun. This was affirmed by the United States Court of Appeals for the Ninth Circuit, "[p]etitioner's arguments ignore the fact that he was recorded discussing the exchange of methamphetamine and firearms and that a trial witness testified that he gave petitioner the handgun in exchange for methamphetamine. This evidence provided more than enough support for the jury's conclusion that petitioner had possessed a firearm in relation to a drug trafficking offense." *See United States v. Hernandez-Arciga, 2014 WL 3729151, \*3-4 (9th Cir. 2014)*.

The First Step Act's changes to § 3582(c)(1)(A)(i) authorizes this Court to reduce Hernandez-Arciga's sentence to time served. It also authorizes a sentence to § 851's recently amended 15-year enhanced mandatory minimum, or with the absence of the § 851 enhancement, a guidelines sentence, which can be further reduced by applying Guidelines Amendment 782. And, in its discretion, the Court can also apply § 924(c)'s exception clause, which would make the 60-month term on count two concurrent.

Hernandez-Arciga understands that the relief he is seeking is discretionary and only points the Court to the injustices inflicted by the § 851 information, the § 924(c) conviction, and the lack of a *Smith* variance to humbly beg this honorable Court to please recognize that he deserves mercy.

## CONCLUSION

Congress has given the Court power to grant Hernandez-Arciga six years of relief from his sentence. Hernandez-Arciga requests that the Court find that there are extraordinary and compelling reasons warranting a reduction in his sentence to time served and order that the BOP and the North Lake CI immediately release him so he can start a new life in a new country before old age and his underlying medical conditions diminish his ability to provide self-care and make his integration into Mexican society less than probable, or any relief that he may be entitled to.

Dated: _June-16-2022_

Respectfully submitted,

*Ademir Hernández A.*

Ademir Hernandez-Arciga
Register No. 70866-065 Unit EC-116
North Lake Correctional Facility
P.O. Box 1500
Baldwin, MI 49304

## CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury, pursuant to 28 U.S.C. § 1746, that on this

_16_ day of _June_____, 2022, he caused a true and correct copy of his

**MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)** to be

mailed first class postage prepaid by placing an envelope containing the aforementioned document

in the United States mailbox located at North Lake CI addressed to the following party:

Geoffrey A. Barrow
United States Attorney's Office
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204

Pursuant to Rules 4(c)(1) and 25(a)(C) of the Federal Rules of Appellate Procedure, Hernandez-

Arciga hereby invokes the prisoner's mailbox rule. His documents are considered filed on the date

they are placed in the prison mail system rather than the postmark date. *See Houston v. Lack, 487*

*U.S. 266, 274-76 (1988).*

Respectfully submitted,

*Ademir Hernández A.*

Ademir Hernandez-Arciga
Register No. 70866-065 Unit EC-116
North Lake Correctional Facility
P.O. Box 1500
Baldwin, Michigan 49304

# EXHIBIT A

APRIL 29, 2022, REQUEST FOR COMPASSIONATE RELEASE TO WARDEN

**M. Breckon, Warden, NLCF**

North Lake Correctional Facility
1805 W. 32nd Street
Baldwin, Michigan 49304

**Re: Request for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and the First Step Act's Changes to 21 U.S.C. § 851 for Federal Inmate: Ademir Hernandez-Arciga Register No: 70866-065, Unit: Echo-Charly**

Dear Warden, Breckon:

I hereby request that you grant me compassionate release from imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and the First Step Act's Changes to 21 U.S.C. § 851, which constitute "extraordinary and compelling reasons."

## A. EXTRAORDINARY AND COMPELLING REASONS

I hereby provide you with the following information to support my request for compassionate release based on the COVID-19 pandemic, the need to care for my elderly parent, and the First Step Act's changes to 21 U.S.C. § 851. In addition, the following factors specific to me demonstrate that I should be granted compassionate release:

- I have served *Over 171* months of my federal sentence
- My projected release date is *April 4, 2029*
- My custody level is *Low*
- My PATTERN score is *Low*
- The COVID-19 virus and its Delta[1] and Omicron[2] variants have been detected in this facility. Inmates have been infected and some have died
- I am Hispanic/Latino[3]

---

[1] According to the DCD, the Delta variant is highly contagious, more than 2x as contagious as previous variants. It spreads faster than early forms of SARS-CoV-2, the virus that causes COVID-19. Given what is known about the Delta variant, vaccine effectiveness, and current vaccine coverage, layered prevention strategies, including wearing masks, are needed to reduce the transmission of this variant. See https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.

[2] According to the CDC, the Omicron variant is spreads more easily than the original virus that causes COVID-19 and the Delta variant. See https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html.

[3] CDC statistics as of August 18, 2020, show that the number of COVID-19 cases involving a Hispanic or Latino persons are 2.8 times higher than for white, non-Hispanic persons. The number of Hispanic cases that result in hospitalization are 4.6 time higher. And the number of Hispanic cases that result in death are 1.1 time higher. *See https:// www.cdc.gov/ coronavirus/ 2019-ncov/ covid-data /investigations- discovery /hospitalizations- by- race ethnicity .html.*

- I am 50-64 years old[4]

I have the following underlying medical conditions, which according to the CDC, place me at heightened risk for infection, severe illness, or death:

- Current or Former Smoker
- Diverticulosis
- Obesity, Severe Obesity, Overweight (Height: 5'8" + Weight: 175 = BMI: 26.6)

I am at an increased risk of serious illness or death if infected with COVID-19 or one of its variants due to my acute diverticulosis. In 2021 National Library of Medicine study, it was determined that gastrointestinal symptomatology are of unique significance in COVID-19 patients, in contrast to other viral illnesses, owning to the fact that they often appear early and worsen during the disease course. While COVID-19-induced diverticulitis remains seemingly rare and largely unexplored, clinicians should maintain a broad differential diagnosis in COVID positive patients presenting with gastrointestinal symptoms. It is vital to institute SARS-CoV-2 precautions in patients who present with either respiratory or gastrointestinal symptoms amidst the current pandemic.[5]

- My adult criminal history includes no convictions involving violence
- I have no disciplinary infractions while serving my sentence

21 U.S.C. § 851: The First Step Act of 2018 made changes to 21 U.S.C. §§ 851 and 3582(c)(1)(A)(i). See P.L. 115-391, 132 Stat. 5194, at § 401(a)(2)(A)(i) and 603(b). In my case, the only reason the prosecutor charged me with a 21 U.S.C. § 851 information was because I refused to cooperate or plead guilty. I went to trial. But based on the First Step Act's changes, my statutory minimum and maximum sentence is now 15 years to life, not 20 years to life. The First Step Act's changes also allow me to utilize § 3582(c)(1)(A)(i) to request compassionate release from, first, the Warden, and then, the district court. Accordingly, the changes made by the First Step Act and the prosecutor's abuse in his discretion in charging me with a § 851 information qualify as extraordinary and compelling reasons for granting me compassionate release.

I have participated in the following BOP programing: Hobby Craft Painting and Art, Parenting Teenagers, Spanish GED 0730-0330, Parenting Ages 5-12, Spanish GED 1230-1430, The Way of The Samurai, Shattered Skies Air-to-Air CO, WALKING With The Dinosaurs, The Way of The

---

[4] CDC statistics as of August 18, 2020, show that the hospitalization rate for people between the ages of 50-64 is 4 times higher. And the death rate is 30 times higher. *See also notes 11-12 and accompanying text, infra.*

[5] SARS-CoV-2 and Acute Diverticulitis: the Expanding Gastrointestinal Manifestations of COVID-19 Infection - PMC (nih.gov). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8016353/

Samurai, Reading is Fundamental, Mavis Beacon Typing Program, Hispanic Culture, and The Planets.

- I am Not an American Citizen. I am a Citizen of the Country of Mexico. I Will Be Certainly Deported to Mexico Upon My Release and Barred From Reentry, Indefinitely

Due to COVID-19 and the First Step Act's changes to 21 U.S.C. § 851, United States District Courts have granted compassionate release to inmates housed at the North Lake Correctional Facility with ICE-detainers and BOP public safety factors who will be deported upon their release and will be barred from reentry. *United States v. Vazquez, No. 2:06-cr-196-TC, 2020 WL 7247069, at \*6–7 (D. Utah Dec. 9, 2020) (unpublished); See also United States v. Villafuerte-Diaz, 2020 U.S. Dist. LEXIS 133478 (S.D. Cal. July 28, 2020) and United States v. Rendon-Marin, 502 F.Supp 3d 1239, 1242 (N.D. Ohio, W.D., 11/23/2020).*

Courts have also granted compassionate release due to the First Step Act's changes to 18 U.S.C. § 924(c). *United States v. Nafkha, No. 2:95-CR-00220-001, 2021 WL 83268, at \*4 (D. Utah Jan. 11, 2021)* (finding that the defendant's "young age at the time of sentencing, the incredible length of his sentence, and Congress's subsequent decision to amend § 924(c), considered together, establish extraordinary and compelling reasons for his compassionate release").

And Courts have granted compassionate release to inmates housed at the North Lake Correctional Facility with an ICE-detainer and BOP Deportable Alien public safety factor who will be deported upon their release and will be barred from reentry. *United States v. Vazquez, No. 2:06-cr-196-TC, 2020 WL 7247069, at \*6–7 (D. Utah Dec. 9, 2020) (unpublished)* (granting compassionate release because defendant is at risk for complications that could lead to serious injury or death if he contracts the virus, living and working conditions at the North Lake Correctional Facility does not allow the prisoners to follow safety measures necessary to avoid infection, and he will be deported to Mexico and barred from reentry); *See also United States v. Carlos Armando Galaz-Felix, a.k.a. TOPO, Case No. 1:03-CR-00062-TC-4, Document No. 879 (D. Utah April 4, 2022)* (granting compassionate release to inmate housed at the North Lake Correctional Facility so he can care for elderly mother in Mexico because any potential danger to the community will be mitigated by his imminent deportation to Mexico and will be barred from reentry).

## B. PROPOSED RELEASE PLANS

In support of my request, I hereby provide you with my proposed release plans, including where I will reside, how I will support myself, where I will receive medical treatment, and how I will pay for such treatment:

If I am released, I will be certainly deported to Mexico. I will live in the city of Morelia in the state of Michuacan with my mom, Rosa Maria. My sons, Jose David and Ademir Esteban, my brother, David, and my sisters, Hilda, and Fabiola, will provide me with financial assistance. They will purchase clothes, food, personal hygiene products, work clothes, and tools. They will also take me to the family doctor for any medical treatments and medications I may need. Along with tools, my family will also help me find employment in a restaurant as a cook. I plan to eventually open my own restaurant.

I will mainly take care of my mother, Rosa, who is 75 years old. She suffers from hypertension, depression, anxiety, and stress. She takes prescription medications to treat all her illnesses. My mother became a widow 47-years ago when my father, who was a teacher, died of depression. She never remarried and raised four children on her own. According to the CDC, if my mother is infected with COVID-19 or any of its variants, she is at an increased risk of serious illness or death. I don't want to lose my mother to the virus or to one of her medical conditions while incarcerated.

## C. ADDITIONAL INFORMATION

In the April 3, 2020, Memorandum noted above, the Attorney General formally directed that BOP "immediately review all inmates who have COVID-19 risk factors, as established by the CDC . . ." because he has found that COVID-19 has created emergency conditions that are "materially affecting" the functioning of the BOP. To be clear, the Attorney General thus directed the BOP to review "all at-risk-inmates—not only those who were previously eligible for transfer" pursuant to 18 U.S.C. § 3624(c)(2).

But conditions merit transfer to home confinement or release for even more inmates. Even those younger than 65 and/or otherwise healthy patients are not immune from infection or serious complications. According to the CDC, nearly 40% of patients hospitalized from coronavirus were 20 to 54 years old.[6] As of March 16, 2020, more than half of those hospitalized and nearly half of those admitted to an Intensive Care Unit were under the age of 65.[7] The Intensive Care National

---

[6] Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S., The New York Times (Mar 20, 2020), at https:// nytimes.com /2020/03 /18/health /coronavirus-young -people.html (last visited March 31, 2020).

[7] Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12 – March 16, 2020, available at https:// www.cdc.gov /mmwr /volumes /69/wr/ mm6912e2.html (last viewed April 9, 2020).

Audit and Research Center in London reports that 45.8% of those between the ages of 50-69 admitted to critical care died in critical care.[8] Data from China reflects that people over the age of 50 face a greater risk of serious illness or death from COVID-19.[9] Moreover, public health experts agree that all incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" infection control is challenging in these settings.[10]

I am at special risk of infection at the North Lake Correctional Facility (NLCF), a GEO run private prison. Its design makes it a detention center and COVID-19 and its variants are rapidly spreading throughout the facility:

> Each Unit contains 26 cells in an upper level and 26 cells on the ground level, for a total of 52 cells. Each cell houses two inmates. The cells contain a double bunk bed, toilet and sink, mirror, a shelf with four hooks, and a stainless-steel table with two sitting areas. All the cells share the same ventilation system.

> The dayroom in each unit consists of 6032 square feet. Cluttered around the dayroom are: (i) five telephones, which are spaced 1½ feet apart; (ii) microwaves, one sink, one paper towel dispenser, and one hand sanitizer dispenser. They are all placed right next to each other; (iii) nine showers, which are right next to each other. They are separated by a 5-foot cinder block wall that extends 3½ feet from the main wall and provide 3½ feet of shower space. The shower area is separated by a 5-foot cinder block wall that's 28 feet long; and (iv) There are 14 stainless-steel tables. Each table sits 7 inmates right next to each other. The tables are placed 5½ feet from each other. They are staggered in the dayroom in 7 rows of two.

I am assigned to Echo-Charly Unit, which houses 104 inmates in very-close proximity. The design of the NLCF makes it impossible to maintain a hygienic living environment and implement the CDC guidelines, which include maintaining a social distance of at least 6-feet. This, coupled with its handling of the COVID-19 pandemic, makes it impossible for the NLCF to minimize or control the virus' spread. Every additional day I spend at the NLCF increases the likelihood of

---

[8] ICNARC report on COVID-19 in critical care, ICNARC (Apr. 4, 2020), available at file: //C:/Users /rigby/ Downloads /ICNARC %20COVID-19 %20report %202020-04-04.pdf %20(2).pdf (last visited Apr. 9, 2020).

[9] Xianxian Zhao, et al., Incidence, clinical characteristics, and prognostic factor of patients with COVID-19 a systemic review and meta-analysis (March 20, 2020), available at https:// www.medrxiv.org /content /10.1101/ 2020.03.17.20037572v1 (last visited Apr. 9, 2020).

[10] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https:// bit.ly /2W9V60s (last visited March 21, 2020).

contracting COVID-19 or its Delta or Omicron variants and suffering serious illness or death. And, although I have been vaccinated, the vaccine is not 100% effective against the Delta or Omicron variants. Some fully vaccinated people will become infected (called a severe breakthrough infection) and experience illness, and death. As of August 30, the CDC and Prevention has received reports of 12,908 severe breakthrough cases of Covid-19 among fully vaccinated people that resulted in hospitalization or death.

For example, when the pandemic began, the NLCF did not initiate mitigation procedures until the first week of April 2020—when it put the facility on full lock down and required that staff wear surgical masks. It did not provide surgical masks to the inmate population until the second week of May 2020. And the BOP did not distribute washable cloth masks to the inmate population until the middle of July 2020. Consequently, inmates contracted COVID-19, and some died from it. Yet, the NLCF refused to test all the inmates for COVID-19. But more importantly, it refused to test all of the inmates who live in the housing units where seriously ill inmates have been removed and taken to medical for treatment. They also refused to test all the inmates who live in the housing units where inmates have died. Moreover, throughout the worse of the pandemic, the NLCF continued to receive inmates from other facilities. Some arrived on August 25, 2020, and September 14, 2020, from a closed GEO facility in the State of Georgia. And, according to laundry staff, because the August 25, 2020, inmates arrived with COVID-19 symptoms, all of their clothes was destroyed. The BOP continues to send inmates to the NLCF.

Some NLCF officers refuse to properly wear their personal protective equipment. They don't wear their face masks or gloves when entering the inmate housing areas. This endangers the inmate population. Just recently, the Fire and Safety Officer, Mr. Morgan, got infected with the virus.

### D. CONCLUSION

In short, the COVID-19 virus and its Delta and Omicron variants, which are highly contagious, puts every incarcerated individual, private facility staff, and BOP staff member at significant risk of infection. This also places the general community at risk because every infection can lead to several more, including those in the community who come in contact with BOP and GEO staff who may not show any sign of their infection, yet still be contagious. Each additional infection puts a further strain on medical personnel and supplies, which are already overburdened. Granting me compassionate release will decrease the population and risk of infection at this GEO facility and will reduce risk of infection and strain on the surrounding community, without endangering the greater community.

I ask that you please immediately consider my case for compassionate release. Thank you for your consideration.

I, *ADEMIR HERNANDEZ ARCIGA*, certify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that on this *29* day of *April*, 2022, I placed my Request for Release to Home Confinement Pursuant to 18 U.S.C. § 3624(c)(2) and Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) in the prison mail system addressed to the Warden.

Respectfully submitted,

X *Ademir Hernandez A.*
Signature

Name: *ADEMIR HERNANDEZ ARCIGA*

Register No: *70866-065*

# EXHIBIT B

BOP Sentence Monitoring Computation Data

```
NLKCX  540*23 *              SENTENCE MONITORING          *    01-26-2022
PAGE 001        *           COMPUTATION DATA             *    10:41:20
                            AS OF 01-26-2022
```

REGNO..: 70866-065 NAME: HERNANDEZ-ARCIGA, ADEMIR


```
FBI NO..........: 286803LA3        DATE OF BIRTH: 11-08-1970  AGE:  51
ARS1............: NLK/A-DES
UNIT............: UNIT E           QUARTERS.....: E03-116L
DETAINERS.......: YES              NOTIFICATIONS: NO
```

FSA ELIGIBILITY STATUS IS: INELIGIBLE

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.

HOME DETENTION ELIGIBILITY DATE....: 10-25-2028

THE INMATE IS PROJECTED FOR RELEASE: 04-25-2029 VIA GCT REL


---------------------CURRENT JUDGMENT/WARRANT NO: 010 ---------------------

```
COURT OF JURISDICTION...........: OREGON
DOCKET NUMBER...................: CR 07-403-16-HA
JUDGE..........................: HAGGERTY
DATE SENTENCED/PROBATION IMPOSED: 10-25-2010
DATE COMMITTED..................: 01-04-2011
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO
```

```
                 FELONY ASSESS  MISDMNR ASSESS  FINES      COSTS
NON-COMMITTED.: $200.00        $00.00          $00.00     $00.00
```

RESTITUTION...: PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

-----------------------CURRENT OBLIGATION NO: 010 ---------------------------
```
OFFENSE CODE....:  391    21:846 SEC 841-851 ATTEMPT
OFF/CHG: 21:846 CONSPIRACY TO POSSESS AND DISTRIBUTE CONTROLLED
         SUBSTANCES CT.1
```

```
 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:    240 MONTHS
 TERM OF SUPERVISION............:     10 YEARS
 RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: CS TO 010/020
 DATE OF OFFENSE................: 06-12-2008
```


G0002      MORE PAGES TO FOLLOW . . .

```
  NLKCX  540*23 *              SENTENCE MONITORING          *    01-26-2022
PAGE 002          *          COMPUTATION DATA              *    10:41:20
                               AS OF 01-26-2022
```

REGNO..: 70866-065 NAME: HERNANDEZ-ARCIGA, ADEMIR


```
-----------------------CURRENT OBLIGATION NO: 020 -----------------------
OFFENSE CODE....: 130    18:924(C) FIREARMS LAWS         FSA INELIGIBLE
OFF/CHG: 18:924(C)(1)(A) POSSESSION OF A FIREARM IN CONNECTION WITH A
         DRUG TRAFFICKING CRIME CT.2

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   60 MONTHS
 TERM OF SUPERVISION............:    5 YEARS
 RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: CS TO 010/010
 DATE OF OFFENSE................: 01-06-2008

-----------------------CURRENT COMPUTATION NO: 010 ----------------------

COMPUTATION 010 WAS LAST UPDATED ON 12-12-2019 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 12-10-2010 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010, 010 020

DATE COMPUTATION BEGAN..........: 10-25-2010
AGGREGATED SENTENCE PROCEDURE...: AGGREGATE GROUP 800 PLRA
TOTAL TERM IN EFFECT............:  300 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:   25 YEARS
AGGREGATED TERM OF SUPERVISION..:   10 YEARS
EARLIEST DATE OF OFFENSE........: 01-06-2008

JAIL CREDIT.....................:   FROM DATE    THRU DATE
                                    01-06-2008   10-24-2010
```


```
G0002       MORE PAGES TO FOLLOW . . .
```

```
  NLKCX  540*23 *          SENTENCE MONITORING        *      01-26-2022
PAGE 003          *          COMPUTATION DATA          *      10:41:20
                             AS OF 01-26-2022

REGNO..: 70866-065 NAME: HERNANDEZ-ARCIGA, ADEMIR


TOTAL PRIOR CREDIT TIME.........: 1023
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 1350
TOTAL GCT EARNED................: 756
STATUTORY RELEASE DATE PROJECTED: 04-25-2029
ELDERLY OFFENDER TWO THIRDS DATE: 09-05-2024
EXPIRATION FULL TERM DATE.......: 01-04-2033
TIME SERVED.....................:      14 YEARS     21 DAYS
PERCENTAGE OF FULL TERM SERVED..:  56.2
PERCENT OF STATUTORY TERM SERVED:  65.9

PROJECTED SATISFACTION DATE.....: 04-25-2029
PROJECTED SATISFACTION METHOD...: GCT REL

REMARKS.......: 12-12-19 GCT UPDATED PURSUANT TO FSA  Q/TMC
```

```
G0002        MORE PAGES TO FOLLOW . . .
```

```
  NLKCX  540*23 *          SENTENCE MONITORING        *     01-26-2022
PAGE 004 OF 004 *          COMPUTATION DATA           *     10:41:20
                            AS OF 01-26-2022
```

REGNO..: 70866-065 NAME: HERNANDEZ-ARCIGA, ADEMIR


---------------------------- CURRENT DETAINERS: ----------------------------

```
DETAINER NO..: 001
DATE LODGED..: 03-28-2014
AGENCY.......: IMMIGRATION & CUSTOMS ENFORCE
AUTHORITY....: ICE ENFORCEMENT & REMOVAL OPERATIONS, BLOOMINGTON, MN
CHARGES......: INVESTIGATION INITIATED FOR POSSIBLE DEPORATION
               MEXICO - A070146559
```

```
G0000        TRANSACTION SUCCESSFULLY COMPLETED
```

# EXHIBIT C

BOP INDIVIDUALIZED NEEDS PLAN – PROGRAM REVIEW



## Individualized Needs Plan - Program Review    (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: HERNANDEZ-ARCIGA, ADEMIR  70866-065

SEQUENCE: 01472990
Team Date: 01-27-2022

| | | | |
|---|---|---|---|
| Facility: | NLK  NORTH LAKE CI | Proj. Rel. Date: | 04-25-2029 |
| Name: | HERNANDEZ-ARCIGA, ADEMIR | Proj. Rel. Mthd: | GOOD CONDUCT TIME |
| Register No.: | **70866-065** | DNA Status: | SST02821 / 02-08-2011 |
| Age: | 51 | | |
| Date of Birth: | 11-08-1970 | | |

### Detainers

| Detaining Agency | Remarks |
|---|---|
| ICE | INVESTIGATION INITIATED FOR POSSIBLE DEPORATION MEXICO - A070146559 |

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| NLK | UNIT E PM | UNITS | 03-16-2020 |

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| NLK | ESL EXEMPT | ESL NEED-PERMANENTLY EXEMPT | 02-03-2011 |
| NLK | GED EARNED | GED EARNED IN BOP | 10-03-2017 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| NLK | | HOBBY CRAFT PAINTING & ART | 09-28-2020 | CURRENT |
| SST | C | RPP6 PARENTING TEENAGERS | 10-13-2017 | 10-19-2017 |
| SST | C | RPP6 SPANISH GED 0730-0930 | 03-12-2016 | 10-03-2017 |
| SST | C | RPP6 PARENTING AGES 5-12 | 02-26-2016 | 03-14-2016 |
| SST | W | RPP6 SPANISH GED 1230 TO 1430 | 05-27-2011 | 03-12-2016 |
| SST | C | THE WAY OF THE SAMURAI | 03-07-2015 | 03-28-2015 |
| SST | C | SHATTERED SKIES: AIR-TO-AIR CO | 02-23-2015 | 02-27-2015 |
| SST | C | RPP6 PARENTING AGES 5-12 | 02-09-2015 | 02-12-2015 |
| SST | C | WALKING WITH THE DINOSAURS | 06-23-2014 | 06-30-2014 |
| SST | C | THE WAY OF THE SAMURAI | 09-24-2013 | 10-11-2013 |
| SST | C | READING IS FUNDAMENTAL | 05-17-2012 | 05-17-2012 |
| SST | C | MAVIS BEACON TYPING PROGRAM | 01-11-2012 | 01-11-2012 |
| SST | C | HISPANIC CULTURE | 09-10-2011 | 10-01-2011 |
| SST | C | THE PLANETS | 06-18-2011 | 08-06-2011 |

### Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|

** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS **

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 01-06-2011 |
| CARE1-MH | CARE1-MENTAL HEALTH | 01-04-2011 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| C19-QUAR | COVID-19 QUARANTINED | 01-19-2022 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 09-19-2021 |
| YES F/S | CLEARED FOR FOOD SERVICE | 09-19-2021 |

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| ED WAIT RS | DRUG EDUCATION WAIT-RQ SPANISH | 01-16-2018 |

### FRP Payment Plan

| Most Recent Payment Plan |
|---|



**Individualized Needs Plan - Program Review    (Inmate Copy)**

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: HERNANDEZ-ARCIGA, ADEMIR  70866-065

SEQUENCE: 01472990

Team Date: 01-27-2022

| Most Recent Payment Plan |
|---|

**FRP Assignment:**    COMPLT    FINANC RESP-COMPLETED        **Start: 12-08-2011**

Inmate Decision:    **AGREED**    $40.00        Frequency: **MONTHLY**

Payments past 6 months:    **$0.00**        Obligation Balance: **$0.00**

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $200.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

*** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***

**FRP Deposits**

Trust Fund Deposits - Past 6 months:  $ N/A        Payments commensurate ?   N/A

New Payment Plan:   ** No data **

**Current FSA Assignments**

| Assignment | Description | Start |
|---|---|---|
| FTC INELIG | FTC-INELIGIBLE-REVIEWED | 12-05-2019 |
| INELIG AUT | FTC-INELIGIBLE OFF CODE - AUTO | 12-17-2019 |
| N-FIN PV Y | NEED - FINANCE/POVERTY YES | 07-16-2020 |
| R-MIN | MINIMUM RISK RECIDIVISM LEVEL | 08-12-2021 |

**Progress since last review**

Utilized Rec
did not enroll in Drug Ed

**Next Program Review Goals**

continue in Hobby Craft
enroll in life skills

**Long Term Goals**

complete hobby craft by 8/2022
complete life skills by 1/2023

**RRC/HC Placement**

No.
Criminal alien releasing to custody of ICE.
Consideration has been given for Five Factor Review (Second Chance Act):
- Facility Resources : N/A -Criminal alien releasing to custody of ICE
- Offense : N/A -Criminal alien releasing to custody of ICE
- Prisoner : N/A -Criminal alien releasing to custody of ICE
- Court Statement : N/A -Criminal alien releasing to custody of ICE
- Sentencing Commission : N/A -Criminal alien releasing to custody of ICE

Inmate is an alien releasing to custody of ICE.

**Comments**

Treaty Transfer: Eligible and not interested.
Review CIMS, FRP, FSA, Treaty Transfer, Emergency #



**Individualized Needs Plan - Program Review    (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: HERNANDEZ-ARCIGA, ADEMIR  70866-065

SEQUENCE: 01472990
Team Date: 01-27-2022

Name:  HERNANDEZ-ARCIGA, ADEMIR          DNA Status:   SST02821 / 02-08-2011
Register No.:  **70866-065**
Age:  51
Date of Birth:  11-08-1970

Inmate   (HERNANDEZ-ARCIGA, ADEMIR. Register No.: 70866-065)

_____

Date

_____          _____
Unit Manager / Chairperson                                     Case Manager

_____          _____
Date                                                                     Date